# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | EDCV 16-137-GW-KKx | Date | June 4, 2020 |
|---|---|---|---|
| Title | *Anthony Ayala v. U.S XPRESS ENTERPRISES, INC., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Terri A. Hourigan | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| David Borgen | James H. Hanson |
| James M. Sitkin | E. Ashley Paynter |
| Justin L. Swidler | |
| Raymond A. Wendell | |

**PROCEEDINGS:**  **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [169]**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [168]**

**DEFENDANTS' MOTION TO DECERTIFY [173]**

Appearances are made by telephone. The Court's tentative ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, the Motions are TAKEN UNDER SUBMISSION. A nonappearance status conference is set for June 15, 2020. Court to issue final ruling.

The Court sets a status conference for June 18, 2020 at 8:30 a.m. Counsel are to file a stipulation and/or joint report by close of business on June 16.

|  | : | 50 |
|---|---|---|
| Initials of Preparer | JG | |

_Ayala v. U.S. Xpress Enterprises, Inc. et al_; Case No. 5:16-cv-00137-GW-(KKx)
Tentative Rulings on: (1) Defendants' Motion for Summary Judgment; (2) Plaintiff's Motion to
Summary Judgment; and (3) Defendants' Motion for Decertification


I.      **Background**[1]

Anthony Ayala ("Ayala") brings this class action against U.S. Xpress Enterprises, Inc.
("USXE") and U.S. Xpress, Inc. ("USX") (collectively, "Defendants"), alleging that USX's
piece-rate compensation system violated California wage and hour laws by failing to pay class
members – driver employees of USX – for time spent on certain work tasks.  USX provides
transporting services, including truckload shipping.  Its truckload drivers haul customers' cargo
to various locations in the contiguous United States.  USX pays for some of their work using a
piece-rate system that calculates compensation based on the number of miles driven, rather than
on the number of hours worked.  California law requires that piece-rate employees be
compensated for "nonproductive time separate from any piece rate compensation."  At issue here
is whether time spent by drivers on certain tasks other than actual driving – such as conducting
pre- and post-trip inspections of their trucks, fueling, and waiting at USX terminals and USC
customer facilities – qualifies as nonproductive time.

A.  Factual History[2]

USX and USXE are Nevada corporations with their principal place of business in
Chattanooga, Tennessee.  Def. SUF ¶¶ 3-4.  USX, a subsidiary of USXE, is a motor carrier.  _Id._ ¶
2.  USX provides truckload services to customers in the forty-eight contiguous states.  USX

---

[1] The following abbreviations are used for the filings: (1) Notice of Removal ("NoR"), ECF No. 1; (2)
Defendants' Opposition to Plaintiff's Motion to Certify Class ("Def. Opp. to Certification"), ECF 80; Court Ruling
("Court Ruling Denying Certification"), ECF No. 83; (3) First Amended Complaint ("FAC"), ECF No. 99; (4)
Plaintiff's Renewed Motion for Certification ("Ayala Mot. for Certification"), ECF No. 102; (5) Court Ruling
("Court Ruling Certifying Class"), ECF No. 117; (6) Defendants' Motion for Summary Judgment ("Def. MSJ"),
ECF No. 168; (7) Plaintiff's Motion for Summary Judgment ("Ayala MSJ"), ECF No. 169; (8) Defendants'
Opposition to Plaintiff's Motion for Summary Judgment ("Def. Opp. to MSJ"), ECF No. 176; (9) Defendants' Reply
in Support of its Motion for Summary Judgment ("Def. Reply"), ECF No. 185; (10) Courting Ruling on Defendants'
Motion for Partial Summary Judgment ("Court Ruling on Partial MSJ"), ECF No. 227; (11) Joint Stipulation on
Supplemental Briefing ("Joint Stip. on Supp. Briefing"), ECF No. 276; (12) Plaintiff's Supplemental Brief Opposing
Decertification ("Ayala Supp. Opp. to Decertification"), ECF No. 278; (13) Plaintiff's Supplemental Brief on the
Cross-Motions for Summary Judgment ("Ayala Supp. MSJ Brief"), ECF No. 279; (14) Defendants' Statement of
Uncontroverted Facts ("Def. SUF"), ECF No. 282-1; (15) Plaintiff's Statement of Uncontroverted Facts ("Ayala
SUF"), ECF No. 282-1; and (16) Defendants' Reply in Support of Motion for Decertification ("Def. Supp. Reply for
Decertification"), ECF No. 284; Plaintiff's Second Supplemental Brief ("Ayala 2nd Supp. MSJ Brief"), ECF No.
305; Defendants' Second Supplemental Brief ("Def. 2nd Supp. MSJ Brief"), ECF No. 306.

[2] The following facts are, unless otherwise noted, not seriously disputed by the parties.

maintains – although Ayala disputes – that it does not manage or direct any drivers out of California, but that some drivers occasionally drive within the state to complete deliveries.  *Id.* ¶ 6.

Ayala is a California resident who was previously employed by USX as a truck driver. *See* NoR ¶ 11.  Prior to beginning work for USX, Plaintiff attended a USX orientation in Dallas, Texas.  *Id.* ¶ 10.

USX drivers are paid to pick up and deliver cargo loads for USX customers.  While some drivers are assigned routes that allow them to return home each night, most USX drivers – including all class members – run "over-the-road" trucks for days at a time.  Drivers either operate a truck on their own, or in teams of two.  Def. SUF ¶ 12.  USX's compensation for these trips is based in part on the number of miles attributable to each delivery route – this number is not the actual number of miles driven, but rather is based on a rough calculation of the shortest distance using information contained various mileage guides used by USX.  *Id.* ¶ 35.  This mileage number is then multiplied by the applicable driver rate to arrive at a compensation number, which may be supplemented by other wage components.  USX maintains business records of each driver's total miles in order to determine the amount to pay each driver, and in order to calculate taxes due in each state where a given driver has traveled.  Def. Opp. to Certification, Exh. 4 ¶ 2.  In addition, USX's records include service logs that record each driver's time entries and the location of each driver's truck when a time entry is recorded.  *Id.*, Exh. 2 ¶ 12.

B.  Procedural History

Ayala first filed this action in San Bernardino County Superior Court on December 23, 2015.  *See generally* NoR.  The complaint alleged that USX failed to compensate putative class members for certain off-the-clock work, did not comply with California's meal and rest period requirements, and did not give properly itemized pay statements or time and pay records.  He brought the action on behalf of a proposed nation-wide class consisting of:

> [A]ll truck drivers who worked or work in California for U.S. Express after the completion of training at any time since four years from the filing of this legal action until such time as there is a final disposition of this lawsuit.

NoR, Exh. 1 ¶ 8.  The operative claim asserts claims for: (1) failure to provide meal and rest periods in violation of California Labor Code §§ 226.7 and 512, and Industrial Welfare Commission ("IWC") Wage Order 9-2001 §§ 11, 12; (2) failure to compensate for all hours of

work performed in violation of Labor Code §§ 221, 223, and 1194, and Wage Order 9-2001 ¶ 4; (3) failure to provide itemized pay statements or maintain required wage and time records in violation of Labor Code § 226, and Wage Order 9-2201 ¶ 7-B; and (4) unfair competition under California Business & Professions Code § 17200.  *See generally* FAC.

Ayala filed a motion for class certification in December 2016, which the Court denied on predominance grounds.  *See* Court Ruling Denying Certification.  The Court denied the motion in large part because it was concerned that the nationwide scope of the class (including drivers residing in 47 states, in addition to California) would require individualized choice-of-law analyses for each of the 48 states the proposed class members lived in.  *Id.* at 7

These concerns were prompted by USX's records, which indicated that during his employment Ayala spent 25% of his work hours in California, and drove 19% of his total miles in California.  Def. Opp. to Certification, Exh. 2 ¶ 12.  In addition, USX records indicated that during the class period (which started in December 23, 2011 and runs through the conclusion of this action) thus far, USX employed 9,860 drivers who completed deliveries that involved driving in or through California and that these drivers traveled in California on a total of 262,345 occasions.  *Id.*  Of these drivers, only about 11% were California residents.  *Id.* ¶ 13.  The Court was concerned that "[i]n light of these circumstances, it is entirely unclear whether each putative Class Member has sufficient contacts with California such that the application of California law is appropriate."  Court Ruling Denying Certification at 7.

Ayala then amended the proposed class to be limited to California residents.  Ayala Mot. for Certification at 8.  The Court granted class certification for this amended class on July 27, 2017.  *See* Court Ruling Certifying Class.  In May 2019, the Court granted Defendants' summary judgment motion to dismiss Ayala's first cause of action for meal and rest period violations because it was recently pre-empted by the Federal Motor Carrier Safety Administration's own hours of service regulations.  Court Ruling on Partial MSJ.  Ayala later voluntarily dismissed his third cause of action for failure to provide itemized wage statements.  Joint Stip. on Supp. Briefing ¶ 8.  Before the Court are Defendants' motion to decertify the class and the parties' cross-motions for summary judgment on the remaining live issues.

## II.     Legal Standards

### A.  Decertification

A district court has discretion to decertify a class.  *See Knight v. Kenai Peninsula*

*Borough School Dist.*, 131 F.3d 807, 816 (9th Cir. 1997)); Fed. R. Civ. P. 23(c)(1)(C).  The "party seeking decertification of a class bears the burden of demonstrating that the elements of Rule 23 have not been established." *Zakaria v. Gerber Prod. Co.*, 2017 WL 9512587, at *16 (C.D. Cal. Aug. 9, 2017) (collecting cases).  "This burden is relatively heavy, since any doubts regarding the propriety of class certification should be resolved in favor of certification." *Sandoval v. M1 Auto Collisions Ctrs*, 2016 WL 6561580, at *12 (N.D. Cal. Sept. 23, 2016). Decertification should not be granted "except for good cause, such as discovery of new facts or changes in the parties or in the substantive or procedural law." *Morales, et al. v. Kraft Foods Grp., Inc.*, 2017 WL 2598556, at *20 (C.D. Cal. June 9, 2017) (internal quotations omitted). Rule 23(a) requires that: (1) the members of the class must be so numerous that joinder is impracticable, (2) there must be questions of law or fact common to the class, (3) the representative's claims and defenses must be typical of the class members' claims and defenses, and (4) the representative must fairly and adequately protect the interests of the class.  The class must also meet one of the requirements of Rule 23(b).  Here, Ayala seeks to maintain the class action by meeting Rule 23(b)(3)'s requirements that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

B.  <u>Summary Judgment</u>

Summary judgment shall be granted when a movant "shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence, and views all evidence and draws all inferences in the light most favorable to the non-moving party. *See id.* at 630-31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *see also Hrdlicka v. Reniff*, 631 F.3d 1044 (9th Cir. 2011); *Motley v. Parks*, 432 F.3d 1072, 1075 n.1 (9th Cir. 2005) (*en banc*).

The initial burden is on the moving party to demonstrate an absence of a genuine issue of

material fact or to demonstrate that the nonmoving party will be unable to make a sufficient showing on an essential element of its case for which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only if the moving party meets its burden must the non-moving party produce evidence to rebut the moving party's claim and create a genuine issue of material fact. *Id.* at 322-23. If the non-moving party meets this burden, then the motion will be denied. *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1103.

## III. Defendants' Motion for Decertification

Rule 23(b)(3) tests whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Under Rule 23(b)(3), the Court must consider four non-exclusive factors in evaluating whether a class action is a superior method of adjudicating plaintiffs' claims: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 at 1190-92 (9th Cir. 2001).

The predominance analysis focuses on "the legal or factual questions that qualify each class member's case as a genuine controversy" and is "much more rigorous" than Rule 23(a)(2)'s requirement of commonality. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). The analysis looks to whether there are common issues the adjudication of which "will help achieve judicial economy," further the goal of efficiency, and "diminish the need for individual inquiry." *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 at 939, 944.

Defendants argue that Ayala's class action cannot satisfy Rule 23(b)'s predominance requirement[3] because Ayala has not adequately demonstrated he can provide evidence on: (1) the

---

[3] "Predominance" requires the court:

find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

    (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

    (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

time spent by class members performing tasks unrelated to their piece-rate work that nonetheless must be compensated under California law as "nonproductive time"; and (2) which class members logged sleeper-berth time while under USX control that was not compensated. Their argument is that the manageability problems in this case are so great as to warrant decertification. Def. Supp. Reply for Decertification at 1.

Defendants' argument runs up against the "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017). They claim that Ayala has not demonstrated he can provide evidence about the amount of "nonproductive time" spent by class members on tasks such as conducting pre- and post-trip inspections of their trucks, fueling, and waiting at USX terminals and USX customer facilities. According to Defendants, this missing evidence is "necessary to establish liability" and to "establish damages." Def. Supp. Reply for Decertification at 4. They argue it is necessary to establish liability because Ayala must first show that class members actually performed these tasks. This objection is unfounded. It is undisputed by the parties that the class members performed these job tasks.[4] What the parties seek summary judgment on is not whether class members performed these tasks, but whether they constitute "nonproductive time" that California law mandates must be separately compensated. For the same reasons, Defendants' argument that Ayala has not offered a way to provide evidence that class members actually spent compensable time in the sleeper berths of their trucks fails: the parties do not seriously dispute the existence of USX's purported on-call policy; at issue here is whether the implementation of that policy exerted control over the class members so as to require compensation.

Therefore, Defendants' evidentiary objection is really just an argument that Ayala has not demonstrated a satisfactory way of calculating damages. To provide estimates about the amount of "nonproductive time" spent by class members on tasks such as pre- and post-trip inspections of their trucks, fueling, and waiting at USX terminals and USX customer facilities, Ayala stated his intent to rely on USX records as well "testimony from class members and other USX

---

(D) the likely difficulties in managing a class action.
Fed. R. Civ. P. 23(b)(3).

[4] USX's own driver handbook, starting in 2013, stated that "the driver is required to perform various job functions . . . including, but not limited to, . . . pre-trip and post-trip inspections of equipment, . . . , fueling, . . . , waiting to load and unload . . . ." Def. SUF ¶ 35.

employees, training materials, and expert analysis." Ayala Supp. Opp. to Decertification at 4. Defendants argue that "no case authorizes a witness with no personal knowledge to provide an 'estimate' of activities that he did not personally perform. Def. Supp. Reply for Decertification at 5. However, "[r]epresentative evidence is nothing new." *Ridgeway v. Walmart*, 946 F.3d 1066, 1086 (9th Cir. 2020). It is true, as Defendants note, that "[m]ere speculation that samples and statistics *might* serve" is not sufficient. Def. Supp. Auth. at 3 (quoting *Kazi v. PNC Bank, N.A.*, No. 18-cv-04180-JCS, 2020 WL 607065, at *7 (N.D. Cal. Feb. 7, 2020)). However, the plaintiff in *Kazi* was attempting to provide representative evidence measuring the amount of time mortgage loan officers spent in training sessions or meetings, *minus* any time they spent during those periods trying to multitask by selling loans. Unlike the tasks at issue in *Ridgeway* and here, the ones in *Kazi* are not repetitive ones that see only limited variation in the amount of time employees spend on them. Defendants' argument runs into the principle, reaffirmed by the Ninth Circuit "again and again," that "the need for individual damages calculations does not doom a class action." *Ridgeway*, 946 F.3d at 1086 (citing *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150 (9th Cir. 2016)). Between USX's own service logs for its drivers which provide an estimate of the total amount of on-duty time each class member spent in California, and the testimony and expert analysis that Ayala has promised, the Court does not see any insurmountable obstacle to calculating damages that was not present in *Ridgeway*. For these reasons, the Court denies Defendants' motion for decertification.

## IV.    Parties' Cross-Motions for Summary Judgment

Ayala's remaining claim against Defendants is his second cause of action, alleging that they failed to compensate for all hours of work performed in violation of Labor Code §§ 221, 223, and 1194, and Wage Order 9-2001 ¶ 4.[5]

### A.    Defendants Dormant Commerce Clause Defense

As an initial matter, Defendants argue that the application of California's minimum wage laws to transient employees like class members who, though residents of California, undisputedly perform much of their work outside of California, violates the Dormant Commerce Clause. Def. MSJ at 4.

The United States Constitution's Commerce Clause grants Congress the authority "[t]o

---

[5] Ayala's fourth cause of action – the unfair competition law claim – is derivative of his second cause of action.

regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]"  U.S. Const. art. I, § 8, cl. 3.  Because the framers gave the federal government the exclusive power to regulate interstate commerce, and because federal law preempts state law, the Supreme Court has inferred the existence of a "dormant" Commerce Clause that limits states' abilities to restrict interstate commerce.  *See New Energy Co. v. Limbach*, 486 U.S. 269, 273 (1988).  At the same time, the Dormant Commerce Clause "respects federalism by protecting local autonomy."  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148-49 (9th Cir. 2012).  "[U]nder our constitutional scheme the States retain broad power to legislate protection for their citizens in matters of local concern such as public health" and "not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States."  *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976).

A facially neutral state-regulation that "regulates even-handedly to effectuate a legitimate local public interest" and whose "effects on interstate commerce are only incidental" may nonetheless violate the Dormant Commerce Clause if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1271 (9th Cir. 2011) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)).  Courts have struck down non-discriminatory state regulations in only "a small number of dormant Commerce Clause cases,"  *Harris*, 682 F.3d at 1148, and "[s]tate laws frequently survive this *Pike* scrutiny."  *Dep't of Revenue v. Davis*, 553 U.S. 328, 339 (2008).  Defendants bear the burden of showing that the application of California's Labor Code would violate the Dormant Commerce Clause.  *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 400 (9th Cir. 2015).

Defendants do not dispute that California applies its Labor Code equally to work performed in California, whether that work is performed by California residents or by out-of-state residents.  However, they argue that if they are forced to comply with the California Labor Code, they will necessarily have to comply with other states' wage and hour laws as well, forcing them "to have multiple sets of policies for individuals depending on their geographic location and residence" and that this would constitute an undue burden that outweighs California's interest in protecting its employees.  Def. MSJ at 6-7.  This, Defendants argue, is problematic because the need for uniform regulation is especially important in interstate trucking, which is the cornerstone of interstate commerce.  *Id.*

8

However, the Dormant Commerce Clause does not apply to state and local laws expressly authorized by Congress. *See, e.g.*, *Northeast Bancorp, Inc. v. Bd. of Gov'rs of Fed. Res. Sys.*, 472 U.S. 159, 174 (1985) ("When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause."). The FLSA contains such an express authorization. Section 218(a) of the FLSA reads: "No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter . . . ." Because Congress expressly authorized states to legislate in this area, the application of multiple minimum wage laws to an employer does not violate the Dormant Commerce Clause. *See Hirst v. Skywest, Inc.*, 910 F.3d 961, 967 (7th Cir. 2018).

   B. Ayala's Claim for Separate Payment of Non-Driving Tasks

At the center of the parties' dispute is the correct application of California's wage laws to USX's piece-rate compensation system. Piece-rate compensation systems are used by some employers because it creates incentives for higher productivity. Under a piece-rate system, employers pay their employees not by the number of hours worked, but rather by the number of activities, tasks, or units of production completed, such as the quantity of produce picked, the amount of carpet installed, or the number of miles driven.

Defendants argue that USX's piece-rate compensation system essentially pays a fixed fee[6] for the trip that is designed to cover all work performed by class members in delivering a cargo load by truck. According to them, although the "piece" – or unit of production – is denominated in miles, it is not limited to only the task of driving, but rather encompasses the entire process of delivering a cargo load. Accordingly, they are not required to compensate Ayala and the class members separately for such tasks as pre- and post-inspections of their trucks, fueling, and waiting at USX terminals and USC customer facilities.

The parties dispute the correct interpretation of California Labor Code Section 226.2, which went into effect back on January 1, 2016. That section provides in relevant part that:

> This section shall apply for employees who are compensated on a piece-rate basis for any work performed during a pay period. This section shall not be construed to limit or alter minimum wage or overtime compensation requirements, or the obligation to compensate employees for all hours worked under any other statute

---

[6] The fixed-fee component is supplemented by other components (such as detention pay, which is computed hourly), but those are not relevant here.

or local ordinance.  For the purposes of this section, . . . "other nonproductive time" means time under the employer's control, exclusive of rest and recovery periods, that is not directly related to the activity being compensated on a piece-rate basis.

> (a) For employees compensated on a piece-rate basis during a pay period, the following shall apply for that pay period:
>
>> (1) Employees shall be compensated for rest and recovery periods and other nonproductive time separate from any piece-rate compensation.

Cal. Labor Code. § 226.2.  Section 226.2 was enacted by the California legislature in response to two watershed California Court of Appeal decisions: *Gonzalez v. Downtown LA Motors, LP*, 215 Cal. App. 4th 36 (Cal. Ct. App. 2013) and *Bluford v. Safeway Inc.*, 216 Cal. App. 4th 864 (Cal. Ct. App. 2013).  An understanding of those cases is helpful in interpreting Section 226.2 and applying it to this case.

In *Gonzalez*, automotive service technicians were paid piece-rate compensation based on the completion of repair tasks, but with a floor based on the applicable hourly minimum-wage: if a technician's piece-rate compensation for any pay period would be less than what she would have earned from an hourly minimum-wage for the same number of hours worked, the employer would pay the hourly-wage figure.  The plaintiffs in *Gonzalez*, technicians who had worked for the defendant employer, claimed they should have been paid a separate hourly minimum-wage for time spent during their work shifts waiting for vehicles to repair and performing other non-repair tasks (such as obtaining parts, cleaning their work stations, attending meetings, traveling to other locations to pick up and return cars, and participating in online training sessions) directed by the employer.  *Gonzalez*, 215 Cal.App.4th at 40.  The Court of Appeal, relying heavily on the reasoning in *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314 (Cal. Ct. App. 2005), agreed with the plaintiffs and held that they were "entitled to separate hourly compensation for time spent waiting for repair work or performing other non-repair tasks directed by the employer during their work shifts . . . ."  *Id.* at 40-41.  This non-productive work had to be separately compensated to satisfy minimum wage law, since the minimum wage law applied to each hour worked and the court found that the non-productive hours were not covered by the piece-rate pay.

In *Bluford*, a Safeway truck driver sued Safeway for failure to pay its truck drivers for their rest periods.  The plaintiff alleged that under Safeway's piece-rate system, drivers were paid "based on miles driven" and the performance of certain tasks.  *Bluford*, 216 Cal.App.4th at 870.

10

However, the system did not provide any payment for rest periods. Safeway responded that rest periods were indirectly covered by the piece-rate system by being subsumed in the mileage rates it paid. *Id.* at 871. The Court of Appeal rejected Safeway's argument, explaining that "under [applicable precedent], rest periods must be separately compensated in a piece-rate system." *Id.* at 872. It found that "[t]here [was] no dispute that Safeway's activity based compensation system did not separately compensate drivers for their rest periods." *Id.*

In response to the *Gonzalez* and *Bluford* decisions, the California legislature enacted Section 226.2, which among other things sought to clarify the requirements for piece-rate compensation by codifying the *Gonzalez* and *Bluford* decisions. *See Nisei Farmers League v. Labor & Workforce Development Agency*, 30 Cal. App. 5th 997 (Cal. Ct. App. 2019). The new law codified the holdings of *Gonzalez* and *Bluford* by mandating that "[e]mployees shall be compensated for rest and recovery periods and other nonproductive time separate from any piece-rate compensation." Cal. Lab. Code § 226.2.

Defendants' argument that USX's piece-rate compensation system is designed to cover all work performed by class members in delivering a cargo load by truck has been raised multiple times before state and federal courts, though the Court has not identified any binding authority that dealt with precisely the same set of salient facts that this case presents. Notably, there is the fact that USX's compensation system in effect pays a fixed-fee per trip. Unlike the system in *Bluford*, the driver's pay does not depend on the actual number of miles driven, undercutting Ayala's argument that drivers were compensated only for time spent driving. Furthermore, USX communicated this clearly to Ayala and other USX drivers and provided strong evidence that it intended for its piece-rate compensation system to cover all activities related to the delivery of its customers' cargo. This included both an express statement saying as much that appeared, beginning in 2013, in its driver handbook as well as Ayala's deposition testimony indicating that that was his understanding.[7]

---

[7] Starting in 2013 (the same year the *Gonzalez* and *Bluford* decisions were issued), USX's driver handbook provided that the piece-rate compensated:

> All hours worked by the driver performing those job functions in completing the trip and delivering the load (i.e., all on-duty time, both driving and non-driving), including but not limited to receiving the dispatch, trip planning for the load, pre-trip and post-trip inspections of the equipment, driving, fueling, on-duty breaks, dealing with customers, waiting to load and unload, and completing and returning paperwork for the load, unless otherwise noted.

Def. SUF ¶ 35. Furthermore, at his deposition, Ayala testified that the piece-rate system "covers everything I got to do in order to get it there. *Id.* ¶ 37.

Ayala points to two federal cases – both decided before *Gonzalez* and *Bluford* - that rejected this argument for systems that appeared to pay per miles actually driven.  In *Cardenas v. McLane FoodServices, Inc.*, 796 F. Supp. 2d 1246, 1249 (C.D. Cal. 2011), another court in this district rejected the argument in a challenge to a defendant motor carrier's mileage-based piece-rate system for failing to include separate compensation for tasks such as "vehicle inspections and completion of paperwork" as well as "pick[ing] up keys and manifests."  Again, as with *Bluford* – but unlike here – the compensation was based on "the number of miles driven on a route."  *Id.*  The defendant argued that these duties were covered by its piece-rate formula "based on the number of cases of product delivered, the number of miles driven on a delivery route, and the number of delivery stops."  *Id.* at 1253.  However, the district court rejected this argument. Relying on the reasoning of the Court of Appeal decision in *Armenta* (the same one that *Gonzalez* relied on), the court found that:

> it is irrelevant whether the pay formula was intended to compensate pre- and post-trip duties, or even if employees believed it covered those duties, if its formula did not actually directly compensate those pre- and post-trip duties.

*Cardenas*, 796 F. Supp. 2d at 1253.  A court in the Northern District of California reached the same conclusion in *Quezada v. Con-Way Freight, Inc.*, No. C 09-03670-JW, 2012 WL 2847609, at *2 (N.D. Cal. July 11, 2012).  There, the parties agreed that the plaintiff was "compensated at a per-mile rate for *all miles driven* and at an hourly rate for some work performed at [defendant motor carrier]'s facilities," but that plaintiff was "not compensated at his hourly rate for vehicle inspections, paperwork completion, and the first hour of wait time in a shift."  *Id.* (emphasis added).  The court rejected the defendant's argument that it did not have to separately compensate plaintiff for these activities because they were built into the mileage rate.  It held that "California law does not allow an employer to 'build in' time for non-driving tasks into a piece-rate compensation system."  *Id.* at 6.

However, some decisions issued since *Gonzalez* and *Bluford* appear to recognize that piece-rate systems denominated in miles may cover non-driving tasks.  In a case confronted with a similar challenge by truck drivers against their employer Wal-Mart's mileage-based piece-rate system, a court in the Northern District of California found that under California law, "activities that are not separately compensated . . . may not be properly be built in or subsumed into the activity pay component of Wal-Mart's pay." *Ridgeway v. Wal-Mart Stores, Inc.*, 107 F. Supp. 3d 1044, 1053 (N.D. Cal. 2015).  Crucially, however, the court expressly limited its ruling to such

activities that "*are explicitly listed and recognized as unpaid activities*."  In *Ridgeway*, Wal-Mart's Driver Reference and Pay Manual specifically stated that "no pay is earned" when a driver: drops a trailer for fueling, is at a weigh scale, or is waiting on a work assignment at a driver's home domicile.  *Id.*, n.6.  An older edition of the manual specifically stated that drivers were not compensated for the first two hours of wait time (though they would be compensated for any wait time beyond two hours).  This limitation appears to suggest the court's view that employees and their employer may reach an agreement to determine the precise scope of the piece-rate component of the employees' compensation.   Though not binding, a recent unpublished Court of Appeal decision also recognized the ability of employees and employers to reach an agreement on the scope of the piece-rate compensation.  In *Jimenez-Sanchez v. Dark Horse Express, Inc.*, 243 Cal. Rptr. 3d 691, 697 (Cal. Ct. App. 2019), plaintiff truck drivers sued defendant trucking company, claiming that its piece-rate system failed to pay for certain work activities "including rest breaks, vehicle inspections, truck washing, delays that are beyond driver control and other activities."  The members of the proposed class "included a number of different types of drivers, whose work involved different tasks and who were paid by different pay formulas."  *Id.* at 697.  It is unclear from the decision how the various piece-rate systems were defined, but at least one driver stated that he was "paid a percentage of the amount defendant receives for the loads, which varies based on mileage and the type of cattle transported," suggesting that his piece-rate compensation was not in fact denominated in miles, but was defined to encompass the delivery of a cargo load.  *Id.* at 705.  The court was however able to find that all "the drivers were paid per load" and that "[w]hat was included in the load that was compensated by the piece-rate payment would *depend upon the agreement of the parties*."  *Id.* at 706 (emphasis added).

Ayala argues that USX's interpretation of Section 226.2 allowing employers and employees to "define the 'piece' being compensated however they choose and to include other tasks in the payment for the piece as long as they are somehow related" would deviate from *Gonzalez* and *Bluford*.  Ayala Supp. MSJ Brief at 12.   The Court, however, disagrees.  USX's interpretation, which would give employees and employers room to reach an agreement defining the scope of a piece-rate system, does not contravene *Bluford*, which was limited to holding that a piece-rate system could not build in *rest periods* into the pay rate.  By limiting the scope of the piece-rate component to what was agreed to by the parties, USX's interpretation is harmonized

with *Gonzalez*, where the employer's explicit policy of supplementing the piece-rate to guarantee the hourly minimum-wage rate was an acknowledgment that work spent on non-repair tasks was not covered by the piece-rate component. In particular, the piece-rate pay in *Gonzalez* necessarily could not have covered all work in a pay period in which it fell short of the corresponding hourly-wage amount. *Cf. Wright v. Renzenberg, Inc.*, CV-13-6642-FMO, 2018 WL 1975076, at *3 (C.D. Cal. Mar. 8, 2018) (holding that piece-rate system that "would adjust the [effective] hourly rate to bring it up to the minimum wage" could not build in pay for non-driving tasks). The Court of Appeal's decision in *Nisei Farmers League v. Labor & Workforce Development Agency*, 30 Cal. App. 5th 997 (Cal. Ct. App. 2019) did not explicitly rule out USX's interpretation. Though the decision cited *Cardenas*, it did not expressly affirm the case's holding that the intent and understanding of the parties is irrelevant. *Id.* at 1005.

USX's compensation system, at least since 2013 – when the driver handbook was issued expressly stating that the piece-rate pay was intended to cover all tasks involved in delivering a cargo load – appears to fall within that narrow range of piece-rate compensation systems that the district court in *Ridgeway* recognized could properly build in pay for certain tasks. It is not seriously disputed that the compensation system paid out fixed fees that drivers knew the amount of in advance, and that USX designed its piece-rate system to cover all tasks related to the delivery of cargo and that the policy was consistent in this formulation.[8]

Ultimately, the Court must decide whether to adopt Ayala's position that any system denominated in miles requires supplemental pay for non-driving tasks, or to adopt a more flexible interpretation that allows drivers and their employers some latitude to define the scope of a piece-rate system. According to Ayala, allowing for any latitude to deviate from its position would "effectively nullify section 226.2 and allow employers to flout the rules from *Gonzalez* and *Bluford* by artfully describing their piece-rate pay structures in their employment contracts." Ayala Supp. MSJ Brief at 12. He argues that California law expressly prohibits employers any

---

[8] To rebut this, Ayala points to deposition testimony from USX officers stating that USX pays drivers by the mile ("[W]e, the industry, are paid usually by our customers on a per-mile basis. So that is how we in turn pay our drivers." Ayala SUF ¶ 4) and a USX training video shown to new drivers that advises them: "when your wheels aren't turning, you're not earning." However, these are informal and imprecise statements. In a loose sense, one could say that the drivers are paid "by mile." However, the fact remains that drivers were paid a fixed fee that they knew in advance of their trips. There is no plausible argument that a driver who knows the dollar amount of his "mileage pay" *in advance of the trip* could think that he was being compensated only for actual miles driven. This awareness, combined with the 2013 driver handbook – which admittedly, as Ayala notes, explicitly states that it is not "not contractual in nature," is enough notice to employees that their compensation was designed to cover all tasks involved in delivering a cargo load.

latitude to define the scope of a piece-rate system that is denominated in miles, and points to California Labor Code Section 219(a), which provides that "no provision of this article [which includes Section 226.2] can in any way be contravened or set aside by private agreement."  Cal. Labor Code. § 219.  Ayala 2nd Supp.  MSJ Brief at 2.  However, that prohibition is against the employer and employee waiving the protection of Section 226.2, which requires that piece-rate employees be compensated for all hours worked, including "rest and recovery periods and other nonproductive time separate from any piece-rate compensation."  It does not prohibit employers and employees from defining the "piece" of the compensation.

Ayala contends that Defendants could not have defined the piece to be the delivery of the cargo because that is "not how USX calculated it."  Ayala 2nd Supp. MSJ Brief.  Because the compensation was calculated by using a mileage and multiplying it by the applicable mileage rate, Ayala argues that the piece could not have been the cargo delivery.  However, this misses the fact that USX pays a *fixed* sum to its drivers for each trip – an amount that the drivers are informed of in advance.   The mileage, X, associated with a trip, is merely used as an intermediate step in arriving at the final fixed-fee amount.  It does not matter if the driver ends up driving more than X miles (if, for example, for part of the trip he takes a longer route to avoid traffic) or fewer than X miles (if the driver takes a shortcut not contemplated by the system) – his pay is the same.

The concern the Court has with Ayala's position is that employers and employees would be prohibited from agreeing to a fixed-fee compensation scheme for cargo delivery unless it had separate compensation components for the non-driving tasks.  That would be the consequence of adopting Ayala's position.  On appeal, the Ninth Circuit observed that its holding did not go so far.   In ruling that inspection payments could not be subsumed into Wal-Mart's piece-rate compensation system for its drivers, the Ninth Circuit made clear that this "[was] not to say that Wal-Mart could never incorporate payments for multiple tasks into [pay system] . . . . sometimes several tasks like rest breaks and inspections could fall under a general provision in the pay plan." *Ridgeway*, 946 F.3d at 1084-85.  To be sure, USX and other employers could break out separate hourly-compensation for non-driving tasks – and likely reduce the fixed-fee amount to offset this.  But to require them to do so would appear to the Court to attach too much importance to form over substance.  In the absence of a clearer directive from any binding authority, the Court will not adopt such a rule here.  Therefore, the Court finds that starting from

15

the issuance of USX's 2013 driver handbook, that USX's compensation system did cover all of the non-driving tasks that Ayala and the class members seek separate compensation for.  USX argues that because its fixed-fee compensation was the same for the entire class period, that it is entitled to summary judgment on this issue for the entire class period.  Def. 2nd Supp. MSJ Brief at 2-3.   However, while the payment system may have been the same, the record does not support a finding that the parties agreed that the compensation covered all delivery-related tasks.  Defendants' cite Ayala's deposition testimony that that was his understanding even prior to 2013, but that is not sufficient to establish the same understanding for the class.  Finally, as a consequence of these findings, the Court denies Ayala's motion for summary judgment on his claim that the class is entitled to penalties under California Labor Code Section 203 based on the minimum-wage violations.[9]

      C.   <u>Ayala's Claim for Payment for Off-Duty or Sleeper-Berth Time</u>

      Ayala's claims that class members were entitled to minimum wage payments for all time logged as off-duty or sleeper-berth time while in California, because USX exercised sufficient control over the class members during these periods.  FAC ¶ 18.[10]

      Federal law requires drivers to log their time in one of four statuses: (1) off duty; (2) sleeper berth; (3) driving; and (4) on-duty not driving.  *See* 49 C.F.R. § 395.8(b).  The first two are non-duty statuses; the third are fourth ones are duty statuses.  The sleeper-berth time is derived from California and federal law, which both require drivers take ten-hour breaks – so-called "layovers" – between each of their driving shifts.  *See* 49 C.F.R. § 395.3(a)(1); Cal. Code Regs. tit. 13, § 1212.5(a).  During this time, drivers formally are not on duty, and they may not drive or perform other work for their employer.  *See* 49 C.F.R. §§ 395.2, 395.8(b); Cal. Code Regs. tit. 13, §§ 1201(u)(4), 1213(c).  During mandatory breaks, drivers may take log their time as off-duty or sleeper-berth time.   13 Cal. Code Regs. § 1212(g)(1)(A); 49 C.F.R. § 395.1(g)(1)(i).  Trucks are equipped with sleeper berths to allow drivers to rest during their

---

[9] Ayala argues that even if the Court finds that USX's pay system covered all the tasks he seeks separate compensation for, that such a finding should "not foreclose [Ayala] from presenting evidence at trial that USX violated the minimum wage" even calculated under this definition.  If there is such evidence (e.g. pay statements, driving logs), Ayala would have it now and the issue could potentially be decided on summary judgment.  The Court would grant Defendants summary judgment on this issue unless Ayala can provide evidence showing that Defendants violated California's minimum wage laws using this definition of its compensation system.

[10] Ayala also makes a separate, but related argument that all time that team drivers (driver-pairs who together operate a truck) drivers logged as sleeper-berth time is compensable.  Ayala's argument for this is separate from that for solo drivers – the Court considers it at the end of this section.

layovers, though there was testimony that indicated that USX drivers sometimes took their layover breaks elsewhere (such as in a hotel) or used it for other tasks such as shopping at a Wal-Mart, doing laundry, or showering.  Def. SUF ¶¶ 34, 46, 55, 68.

Whether USX was required to pay drivers minimum wage for time logged as off-duty or sleeper-berth ultimately turns on whether USX exercised "control" over its drivers during such periods, within the meaning of California employment law.  If so, USX needed to pay drivers minimum wage for this time; if not, USX did not have to pay compensation.

Ayala argues that USX exerted control over drivers during at least some of the periods logged as off-duty or sleeper berth time in one of two ways.  First, Ayala claims that "USX fleet managers routinely instructed drivers to change their duty status to 'Off Duty' or 'Sleeper Berth' while they were waiting to deliver cargo at the facilities of USX customers."  Ayala Supp. MSJ Brief at 6.  Second, Ayala argues that USX policy imposed on-call and cargo security duties on its drivers during their off-duty and sleeper-berth time that subjected them to USX's control.  *Id.* at 5.  The Court considers these two arguments separately.

   a.   *Time spent unloading cargo at USX terminals and customer facilities*

The Court finds that there is a triable issue of fact as to whether USX is liable for unpaid minimum wages for time that class members spent unloading cargo at customer facilities – time during which drivers are clearly under USX control – that was logged as either off-duty or sleeper-berth time.  USX contends that it has no such policy, and refers to sections in its 2009 and 2013 driver handbooks which provide that "[a]ll drivers are instructed to be familiar with and abide by the [hours of service regulations]," *see* Def. MSJ., Exh. A-4, as well as deposition testimony from USX's safety director, David Tomshack, that USX instructed its drivers to "log it like you do it, which means . . . . If you're on duty, not driving, it needs to be on "on duty, not driving."  Def. Opp. to MSJ, Exh. Q.  However, Ayala has provided sufficient evidence to dispute whether these policies were implemented as stated.  In logs of text messages exchanged between USX fleet managers and drivers, there are numerous instances of fleet managers instructing drivers to log their time spent loading or unloading as sleeper-berth time so as to conserve their on-duty time (federal regulations set upper limits on the rate at which drivers can log on-duty time; in particular, one regulation prohibits certain drivers from driving more 70 hours within 8 consecutive days, *see* 49 C.F.R. § 395.3(b)(2)).  *See* Ayala Supp. MSJ Brief, Exh. B (containing messages including: "Please log sleeper berth to save ur 70 hr clock while getting

17

loaded," "be sure to log offduty or sleeper to save your 70 while they are unloading you").  There is some evidence to suggest that USX may have been cutting down on this practice.  For instance, one message from a fleet manager stated:

> A message that safety just told us. Make sure when you are unloading that you are listed as unloading.  They told us they have termed a few drivers that unload while listed as off duty.  Log everything legal.  They are cracking down on logs.

*Id.*  Accordingly, the Court denies both parties' motions for summary judgment on this issue.

### b.  *On-call and cargo security duties*

Ayala's second argument is that the on-call and cargo duties USX imposed on its drivers during their off-duty and sleeper-berth time constituted sufficient control to require compensation.  Under California law, employers must pay employees at least the minimum wage per hour for all hours worked. Cal.Code Regs., tit. 8 § 11090.  "Hours worked" is defined as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."  *Id.*  "[A]n employee who is subject to an employer's control does not have to be working during that time to be compensated."  *Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 582 (Cal. 2000).

### i.  On-call duties

California law prohibits "on call rest periods."  *Augustus v. ABM Security Services*, 2 Cal. 5th 257, 260 (Cal. 2016).  In *Augustus*, the defendant's policy of "requir[ing] plaintiffs to keep radios and pagers on, remain vigilant, and respond if the need arose" during their state-law mandated rest breaks constituted sufficient employer control that it conflicted with the requirement that they be relieved of "all work-related duties and employer control."  *Id.* at 271.  However, this is not a blanket prohibition of everything that is referred to as an on-call system.  The California Supreme Court did observe that "[n]othing in our holding circumscribes an employer's ability to reasonably reschedule a rest period when the need arises."  *Id.*  Ayala points to deposition testimony from David Tomshack, USX's safety director and Rule 30(b)(6) witness, that "except when a driver is on a DOT-mandated break, the driver is on call while over-the-road with USX."  Ayala SUF ¶ 31.  However, in the very lines cited by Ayala, Tomshack stated that "our drivers aren't really on call."  Ayala MSJ, Exh. 15 at 98:5.  Defendants offered testimony that USX policy was to limit calls or messages during a driver's 10-hour sleeper berth time and, crucially, to not expect a response to messages sent during that window.  Def. MSJ, Exh. C ¶ 5, Def. Opp. to MSJ, Exh. K at 13:23-14:9.

Ayala contends that Defendants nonetheless must still compensate class members for time logged as off-duty (when there was no policy of limiting calls) because of their on-call duties.  In response, Defendants provided deposition testimony from class members stating that they could turn off or mute their phone or DriverTech units (including during off-duty time).  Def. Suf. ¶ 85.  An operations training specialist for USX noted that USX would ocassionally need to reach a driver to inform them "[i]f the load information changes, if the delivery location changes or the driver instructions need to be different."  Ayala MSJ, Exh. 22 at 100:11-17.  None of this, however, assigns any task that requires a driver's immediate action.  If the destination of a driver's cargo changes mid-route from Los Angeles to San Francisco, the driver would want to know of the change as soon as possible.  But merely being open to such notifications does not constitute being required "to respond when needs arise."  *Augustus*, 2 Cal. 5th at 271.  The same operations training specialist did note that USX would also reach out to drivers to inform them that they had been assigned a cargo load, and ocassionally – for high-value or otherwise important loads – USX would want immediate confirmation from a driver that they received the assignment.  Ayala MSJ, Exh. 22 at 100:22-25.  It is possible that in some of those cases, the driver would be expected to take some immediate action beyond confirming receipt of the message.  However, Ayala has not cited any evidence to show if that was the case, and if so, what those tasks might be.  Accordingly, the Court finds that in these situations, there is a triable issue of fact as to whether USX's purported on-call policy constitutes "an affirmative responsibility to remain on call, vigilant, and at the ready," *Augustus*, 2 Cal. 5th at 271, or is rather a way for USX to reasonably reschedule a rest period.

Whether the cargo security duties constitued sufficient control requires consideration of two separate policies.  The first is the default policy that USX drivers must follow for regular cargo loads; the second is one that USX applies to what are deemed "high value" cargo loads.

### ii.   Regular cargo loads

Ayala argues that USX's policies requiring that drivers not leave their trucks unattended without advance permission, and that they be on call – that is accessible via text message and phone – even while logging off-duty or sleeper-berth time constituted sufficient control.  For the former, Ayala relies on a March-April 2013 Terminal Tip Sheet that USX issued, which read:

> It has been reported that some groups are watching locations of interest, following the equipment for long distances and then waiting for the most advantageous opportunity to surface where they can obtain the cargo and equipment.  This

happens most often when the vehicle is left unattended and can take place in public and non-secure locations.  Please always follow established HVP and Cargo Security procedures.  These are in place to help reduce the likelihood of you being identified as a "soft" target.  Maintain awareness of your surroundings and remember if something does not feel right or you are suspicious of a situation on the road, notify your Driver Manager and contact law enforcement.  Your personal safety is extremely important.  If you leave your equipment unattended, make sure you are following proper security procedures and have obtained permission to do so.  Submit your MACRO 39 (Unattended Equipment Request) with accurate information.

Ayala SUF ¶ 73.  Ayala also cites to testimony from USX officers that drivers frequently had to be available to take calls and respond to messages through USX's DriverTech messaging system, Ayala SUF ¶¶ 31-33, as well as various training videos that "emphasiz[ed] the magnitude of cargo theft and the importance of cargo security and instruct[ed] drivers on steps they should take to prevent crime."  Ayala Supp. MSJ Brief at 5.

The Ninth Circuit observed recently that "[w]hat constitutes control in California is not so clear."  *Ridgeway v. Walmart*, 946 F.3d 1066, 1078 (9th Cir. 2020).  However, some general principles apply.  One is that an employer may place some constraints on an employee's movement during breaks without exerting control, though if the restrictions go too far then they can constitute control.  *See Augustus v. ABM Sec. Servs., Inc.*, 2 Cal.5th 257 (2016).  Another is that "[t]he level of the employer's control over its employees, rather than the mere fact that the employer requires the employee's activity, is determinative."  *Morillion v. Royal Packing Co.*, 22 Cal.4th 575 at 587 (Cal. 2000).  "In short, the question of control boils down to whether the employee may use break or non-work time however he or she would like."  *Ridgeway*, 946 F.3d at 1079 (citing *Mendiola v. CPS Sec. Sols., Inc.*, 60 Cal.4th 833 (Cal. 2015)).

The Court notes that the tip sheet, on its own, is not sufficient to codify a company-wide USX policy to support Ayala's class action claims as they currently stand.  First, because it is dated from 2013, it does not cover the entire class period, which extends back to December 23, 2011.  Second, it is not clear that something presented in a "tip sheet" carries the force of official company policy.  USX argues that it does not, and provided a copy of its "Cargo Security Policy Guidelines" document, which does not require drivers to seek pre-approval before leaving a truck unattended.  Def. MSJ, Exh. A-2.  Therefore, the Court finds that there is a triable issue of fact as to whether this is in fact a USX policy and denies Ayala's request for summary judgment on the issue.  Even if the tip sheet that Ayala relies on did represent USX policy, the Court could

not conclude as a matter of law that if enforced as written it would constitute control.  Ayala argues that this policy is necessarily more restrictive than the Wal-Mart policy in *Ridgeway*, which required drivers to get pre-approval before spending off-duty or sleep-berth time at home. While USX's purported policy requires pre-approval for a much broader range of movement (any time a driver leaves a truck unattended), Ayala has not offered sufficient evidence showing how that policy was enforced (such as what the process was for submitting these requests, how they were granted, and how burdensome the entire process was) to suggest that it was in fact more restrictive than the one at isse in *Ridgeway*.  Furthermore, Ayala has not offered any evidence of what, if any, disciplinary action drivers faced for leaving their trucks unattended without authorization.  Though disciplinary consequences are not required to find that a constraint constitutes control, they do go to whether a policy is an actual restraint or merely an exhortation.  Finally, USX offered testimony suggesting that this purported policy was not what was implemented.  One fleet manager stated that "I don't ask my drivers to send [MACRO 39] a whole lot unless they're going on home time and they're going to be away from the truck.  But not all drivers send it, and I don't call them if they haven't sent it.  We just ask them to."  Def. Opp. to MSJ; Exh. K at 29:2-12.  Another fleet manager stated that he did not expect his drivers to send a MACRO 39 when leaving their vehicles unattended.  *Id.*, Exh. F at 28:15-25 ("No, there is no macro for [indicating that a driver is leaving a vehicle unattended while on-duty]").  For these reasons, the Court denies summary judgment on this issue.

                iii.  High-value cargo loads

USX requires greater driver precautions for high-value cargo loads.  For solo drivers, both the 2009 and 2013 USX driver handbooks and USX training slides state that "[t]ime away from truck must be limited to one hour maximum."  Def. MSJ, Exh. A-4, C-1.  First, Defendants offer deposition testimony from drivers that they were not "prevented from getting food, engaging in other personal business (such as taking a shower or doing laundry or grocery shopping)" because of this policy.  Def. SUF ¶ 46.  However, this is unavailing because the policy here clearly "imposed constraints on employee movement such that employees could not travel freely and avail themselves of the full privileges of a break."  *Ridgeway*, 946 F.3d at 1080. Here, USX's policy tethers drivers to their truck.

Defendants next argue that the Federal Aviation and Administration Act of 1994 ("FAAAA"), 49 U.S.C. § 14501 *et seq*, preempts Ayala's minimum wage claims here.  Section

14501 of the FAAAA preempts a wide range of state regulation of intrastate motor carriage.  It provides in relevant part:

> (c) Motor carriers of property.
>
>> (1) General Rule.  Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property.

49 U.S.C. § 14501.  However, Defendants' argument has been rejected repeatedly in federal courts since the Ninth Circuit's decision in *Dilts v. Penske Logistics, LLC*, 769 F.3d 637 (9th Cir. 2014).  In *Dilts*, the Ninth Circuit held that the FAAAA did not preempt California's meal and rest-break laws.  Following the reasoning in that case, district courts in this circuit have repeatedly held that the FAAAA does not preempt California's minimum wage laws, including in particular California Labor Code §§ 221, 223, and 1194 and IWC Wage Order 9-2011, which Ayala's claims fall under.  *See, e.g.*, *Yoder v. Western Express, Inc.*, 181 F. Supp. 3d 704, 713 (C.D. Cal. 2014); *Ridgeway v. Wal-Mart Stores, Inc.*, No. 08-cv-05221-SI, 2016 WL 4529430 (N.D. Cal. Aug. 30, 2016); *see also Californians For Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184 (9th Cir. 1998) (similar reasoning in holding that the FAAAA did not preempt California's prevailing minimum wage law, based on California Labor Code §§ 1770-80).  The Court therefore rejects Defendants' preemption defense and grants summary judgment in favor of Ayala's claims that solo drivers are entitled to minimum wage payment for off-duty and sleeper-berth time logged for high-value cargo loads while in California.[11]

Team drivers pose a more involved question, because USX policy required that at least one driver be with the truck at all times for high value cargos.  While the truck is moving, this does not make any difference.  However, while the truck is stationary, it does matter because because the two team drivers will have to agree on one of them being designated to stay with the truck (the other driver may be free to leave the truck, or may decide to stay with the truck as well).  The time logged by the "designated driver" as off-duty or sleeper-berth during these stationary periods should be separately compensated.  While the Court is able to decide this on summary judgment, the task of determining which driver in a team was the "designated driver" is a fact-intensive task.  When a truck is at rest, it seems likely that both drivers will at some point

---

[11] This does not apply to team drivers carrying high-value loads.

simultaneously be in off-duty or sleeper-berth status.  Determining which driver was the "designated driver" in those situations is something that the Court cannot resolve here on a motion for summary judgment.

       *c.  Team drivers*

       Finally, Ayala claims that class members are entitled to minimum wage payments for *all* sleeper-berth time that they logged while working as team drivers in California.  As opposed to solo drivers, who are solely responsible for driving and operating their trucks, team drivers operate in pairs of two, so that they are able to take turns operating the truck at various intervals. While one team driver is actually driving the truck, the other driver is usually riding along so that he or she can take over driving for the next interval.  Ayala argues that because the non-driving partner was essentially tethered to the truck, USX exerted sufficient control over the person so that the time spent riding – whether logged as off-duty or sleeper-berth time – must be compensated.  Ayala MSJ at 21.

       First, the Court notes that it already found that for high value loads, exactly one driver in a team is entitled to separate, minimum-wage compensation for cargo-security duty while the truck is stationary.  However, here Ayala seeks compensation for all sleeper-berth time, which goes beyond high value loads.  For the following reasons, the Court denies summary judgment on that part of Ayala's claim.

       Team driving is optional for drivers, who are free to do only solo driving.  This opt-in and the mobility restraints it entails are similar to what the Ninth Circuit considered in *Rodriguez v. Taco Bell Corp.*, 896 F.3d 952 (9th Cir. 2018).  There, Taco Bell offered its employees at its restaurant locations the option to purchase a discounted meal during their rest periods.  However, the policy required employees who purchased the discounted meal to eat it in the restaurant (according to Taco Bell, this was to ensure that the benefit was utilized only by employees).  The plaintiffs in *Rodriguez* sued Taco Bell, arguing that "Taco-Bell's on-premises discount policy subjected the employees to sufficient employer control to render the time employees spent consuming the meals as working time under California law."  *Id.* at 955.  The Ninth Circuit rejected this argument, finding that plaintiffs had "not alleged nor introduced any evidence to show that Taco Bell pressured its employees to purchase the discounted meals" and that Taco Bell did "not otherwise interfere with the employees' use of the break time or require the employees to serve the interests of Taco  Bell."  *Id.* at 956-57.  The Court finds the situation here

very similar.  As already noted, team-driving is optional.  Drivers are attracted to it because of some of the advantages it offers, such as the ability to share duties with a teammate.[12]  While USX may have required a team-driver not driving the truck to be riding in the truck (otherwise team driving would not be possible), Ayala has not alleged that USX otherwise interfered with a non-driving team-driver's use of their off-duty or sleeper-berth time.

Ayala argues that because the Court found that solo drivers are entitled to minimum wage payment for off-duty and sleeper-berth time logged for high-value cargo loads while in California, this means team drivers did not have a meaningful alternative and that therefore team drivers should be compensated for *all* sleeper-berth time (for both regular and high-value loads).  Ayala 2nd Supp. MSJ Brief at 6.  The Court disagrees.  The mere fact that a portion of the solo driver compensation system was found to be defective does not appear to invalidate it as an alternative and Ayala does not cite any authority for this principle.  Given this and the limited amount of high-value cargo loads, the Court will not grant Ayala summary judgment on its team-drivers-specific claims, beyond the designated-driver pay for high-value loads discussed earlier.

> D.  Ayala's Unfair Competition Law Claims

Ayala also alleges a violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*, based on the alleged minimum wage law violations. Defendants argue that this claim must fail as a matter of law because it is entirely derivative of the minimum wage violations which they argue all fail as a matter of law.  However, because the Court has granted Ayala partial summary judgment on a part of his minimum wage claims and found that there is a triable issue of fact as to others, Ayala's UCL claims still survive.

> E.  USX and USXE Joint Liability

The analysis so far has considered only USX.  Ayala seeks to hold USXE liable for its minimum wage claims against USX based on a theory that USXE was a joint employer of him and the class members.  As a threshold matter, Defendants argue that this argument is untimely because it was presented for the first time on summary judgment – the complaint had put forth an integrated enterprise theory, but not a joint enterprise.  However, *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989 (9th Cir. 2006), which Defendants cite to for this principle, stated only that a party could not rely on allegations raised for the first time at summary judgment of a civil

---

[12] Compensation for a team driver uses the delivery path's total mileage – it does not pay the two team drivers different amounts based on the number of miles each driver personally drove.  Ayala SUF ¶ 36.  However, the per-mile rate is lower for team drivers than it is for solo drivers.

conspiracy claim to toll the applicable statute of limitations.

Under California law, claims for unpaid wages under California Labor Code Section 1194 may be asserted only against the employer. *Martinez v. Combs*, 49 Cal. 4th 35, 49 (Cal. 2010). In *Martinez*, the California Supreme Court held that IWC wage orders define the employment relationship and therefore who may be liable in an action to claim unpaid wages. Accordingly, an employer is one who: 1) exercises control over the wages, hours and working conditions of an employee; 2) suffers or permits an employee to work; or 3) engages an employee, thereby creating a common law employment relationship. *Id.* at 64.[13] The first two prongs, the court noted, reflected the IWC's intent to expand the employer definition beyond what California common law provided (the third prong).

Ayala appears to argue that summary judgment is appropriate on the first two *Martinez* prongs. He relies solely on deposition testimony which established that USX's pay practices "are set by six individuals, five of whom directly work for [USXE]," and on testimony from USX's President and Chief Administrative Officer, Lisa Pate, that "specifically confirmed that [USXE] makes payroll decisions for [USX], which implements those decisions through its direct operational control over the drivers." Ayala MSJ at 25. For the latter, Ayala cites to Pate's testimony that a decision to change the compensation of drivers in California "would require individuals from the [USXE] team . . . to contribute to that decision making and ultimately make whatever decision they choose to make." Ayala SUF ¶ 53. However, as Defendants note, Ayala omitted the part of Pate's testimony saying that the USXE team would have to "put on their [USX] hats," reflecting the fact that USX and USXE shared common officers. Def. Reply at 185. Ayala has not offered any evidence besides the sharing of common officers to suggest that USXE – as opposed to five of its officers wearing their USX hats – controlled these wages or had the power to prevent Ayala and class members from working. Therefore, the Court finds that there is a triable issue of fact as to whether USXE is an employer of Ayala and class members for the purposes of their minimum wage claims.

## V.    Conclusion

Based on the foregoing discussion, the Court **DENIES** Defendant's motion for decertification. The Court **GRANTS IN PART** Defendant's motion for summary judgment, finding that since the issuance of USX's 2013 driver handbook, non-driving tasks such as

---

[13] This definition is the same across all of the IWC's wage orders.

conducting pre- and post-trip inspections of their trucks, fueling, and waiting at USX terminals and USC customer facilities do not constitute "nonproductive time" under California Labor Code Section 226.2.  However, it finds that there is a triable issue of fact as to whether that is the case prior to the issuance of the 2013 handbook.  The Court **GRANTS IN PART** Ayala's motion for summary judgment, finding that: (1) solo drivers delivering high-value cargo loads are entitled to minimum-wage payment for all off-duty and sleeper-berth time logged while in California; and (2) for team drivers delivering high-value cargo loads, the driver designated to stick with the truck while it is stationary is entitled to minimum-wage payment for any off-duty and sleeper-berth time logged while the truck was stationary in California.  The Court **DENIES** the remaining portions of the parties' cross-motions for summary judgment.